# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |
|---|---|
| IN RE TRUECAR, INC. STOCKHOLDER DERIVATIVE LITIGATION | ) ) ) ) ) CONSOL. C.A. No. 2019-0672-AGB |

## MEMORANDUM OPINION

Date Submitted: June 11, 2020
Date Decided: September 30, 2020

Thomas A. Uebler and Jeremy J. Riley, MCCOLLOM D'EMILIO SMITH UEBLER LLC, Wilmington, Delaware; P. Bradford deLeeuw, DELEEUW LAW LLC, Wilmington, Delaware; Melinda A. Nicholson, Nicolas Kravitz, and Eda Ayrim Walker, KAHN SWICK & FOTI, LLC, New Orleans, Louisiana; Ashley R. Rifkin and Steven R. Wedeking, ROBBINS LLP, San Diego, California; Jeffrey S. Abraham and Michael J. Klein, ABRAHAM, FRUCHTER & TWERSKY, LLP, New York, New York; *Attorneys for Plaintiffs David Bryan, Subash D'Souza, and Herbert Silverberg.*

Shannon E. German, WILSON SONSINI GOODRICH & ROSATI, P.C., Wilmington, Delaware; Jerome F. Birn, Jr. and Catherine Moreno, WILSON SONSINI GOODRICH & ROSATI, P.C., Palo Alto, California; *Attorneys for Defendants Abhishek Agrawal, Robert Buce, Christopher Claus, Steven Dietz, Neeraj Gunsagar, Michael Guthrie, John Krafcik, Erin Lantz, John Mendel, Wesley Nichols, Victor "Chip" Perry, John Pierantoni, Brian Skutta, Jeff Swart, and Ion Yadigaroglu, and Nominal Defendant TrueCar, Inc.*

Gregory P. Williams, Brock E. Czeschin, and Kevin M. Regan, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; *Attorneys for Defendant Neeraj Gunsagar.*

Albert H. Manwaring, IV and Albert J. Carroll, MORRIS JAMES LLP, Wilmington, Delaware; Brian Michael Lutz and Michael J. Kahn, GIBSON, DUNN & CRUTCHER LLP, San Francisco, California; *Attorneys for Defendants United Services Automobile Association and USAA Property Holdings, Inc.*

Jon E. Abramczyk and Ryan D. Stottmann, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; *Attorneys for Defendants Upfront II, L.P., Upfront III, L.P., Upfront II Investors, L.P., Upfront II Partners, L.P., Upfront III Investors, L.P., Upfront III Partners, L.P., Capricorn AIP-Private Investment Fund I, L.P., HIT Splitter, L.P., Capricorn Investment Group, LLC, and Carthage, L.P.*

Jon E. Abramczyk and Ryan D. Stottmann, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Ralph C. Ferrara and Ann M. Ashton, PROSKAUER ROSE LLP, Washington, District of Columbia; Julia D. Alonzo, PROSKAUER ROSE LLP, New York, New York; *Attorneys for Defendant Vulcan Capital Growth Equity Management LLC.*

**BOUCHARD, Chancellor**

TrueCar, Inc. operates a platform designed to connect consumers looking to purchase a car with automobile dealers via the internet. Most of the consumers come to TrueCar's platform from its affinity partners. In November 2017, TrueCar announced it had sustained a loss in the third quarter and was lowering its guidance. During an earnings call the same day, management explained that TrueCar's most important affinity partner, USAA, recently launched a significant website redesign and that sales generated by USAA were down 5% from the prior year. TrueCar's stock price fell over 35% the next day. A federal securities action followed. This action followed after that.

In this action, stockholders of TrueCar assert derivative claims for breach of fiduciary duty, insider trading, unjust enrichment, contribution and indemnification, and aiding and abetting a breach of fiduciary duty against fifteen current and former officers and/or directors of TrueCar and against a series of entities that sold stock in a secondary offering in May 2017. Each of the defendants moved to dismiss the complaint.

The threshold issue in this case is whether plaintiffs' failure to make a demand on the TrueCar board to initiate litigation should be excused. Plaintiffs advance a host of reasons why they believe making a demand would have been futile on the theory that a majority of the directors on the board when this action was filed acted

1

in bad faith and would face a substantial likelihood of liability with respect to the claims in this case.

In this decision, the court concludes that plaintiffs have failed to plead particularized facts sufficient to impugn the ability of any of the members of the demand board, let alone a majority, to have considered a demand impartially. For this and the other reasons discussed herein, the complaint will be dismissed in its entirety.

## I.      BACKGROUND

Unless otherwise noted, the facts recited in this opinion are based on the allegations of the Verified Consolidated Stockholder Derivative Complaint ("Complaint") and documents incorporated therein.[1]   Any additional facts are subject to judicial notice.

### A.      The Parties

Nominal Defendant TrueCar, Inc., ("TrueCar" or the "Company") is a Delaware corporation that connects customers via the internet with automobile dealers. Its principal place of business is in Santa Monica, California.[2]

---

[1] Verified Consolidated S'holder Deriv. Compl. ("Compl.") (Dkt. 16). *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013) ("[P]laintiff may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms" in connection with a motion to dismiss).

[2] Compl. ¶¶ 25, 75.

The plaintiffs in this case are David Bryan, Subash D'Souza, and Herbert Silverberg (collectively, "Plaintiffs"). They allege they were stockholders of TrueCar at the time of the alleged misconduct and have been stockholders continuously since then.[3]

The defendants in this case include six of TrueCar's current and former officers, nine current and former members of TrueCar's board of directors (the "Board"), and four groups of entities that sold shares of TrueCar in a secondary offering that closed in early May 2017 (the "Secondary Offering").[4]

The first group of stockholder entities is United Services Automobile Association ("USAA") and its affiliate USAA Property Holdings, Inc. USAA is an unincorporated association with its primary offices in San Antonio, Texas.[5] USAA offers its members "services related to insurance, banking, investing, real estate, retirement and IRAs, health insurance, and shopping and discounts."[6] USAA was TrueCar's largest stockholder and held approximately 14% of the Company's

---

[3] *Id.* ¶¶ 22-24.

[4] *Id.* ¶ 8. The Complaint alleges that TrueCar conducted the Secondary Offering on April 26, 2017, and that various sales in connection with the Secondary Offering occurred on May 2, 2017. *Id.* ¶¶ 112, 176.

[5] *Id.* ¶ 41.

[6] *Id.*

common stock as of January 2017.[7]  In the Secondary Offering, USAA sold approximately 26% of its holdings and received over $51 million in proceeds.[8]

The second group of stockholder entities is comprised of Upfront II, L.P., Upfront III, L.P., Upfront II Investors, L.P., Upfront II Partners, L.P., Upfront III Investors, L.P., and Upfront III Partners, L.P., (collectively "Upfront"), which sold approximately 1.5 million shares in the Secondary Offering.[9]  The third group of stockholder entities includes Capricorn AIP-Private Investment Fund I, L.P., HIT Splitter, L.P., Capricorn Investment Group, LLC, and Carthage, L.P., (together "Capricorn"), which sold approximately 509,000 shares in the Secondary Offering.[10] The fourth group consists of Vulcan Capital Growth Equity Management, LLC ("Vulcan"), an affiliate of which sold approximately 1.1 million shares in the Secondary Offering.[11]

Defendants Victor Perry, Michael Guthrie, John Pierantoni, Neeraj Gunsagar, Jeff Swart, and Brian Skutta are current and former TrueCar officers.  Perry served as TrueCar's President and Chief Executive Officer, and as a member of the Board

---

[7] *Id.* ¶¶ 1, 79.

[8] *Id.* ¶¶ 8, 165.

[9] *Id.* ¶ 42.

[10] *Id.* ¶¶ 33, 43.

[11] *Id.* ¶ 44.

from December 2015 until July 2019.[12]  Guthrie served as TrueCar's Chief Financial Officer from January 2012 until January 2018.[13]  Pierantoni, Gunsagar, Swart, and Skutta, served as TrueCar's Chief Accounting Officer, Chief Marketing Officer, General Counsel, and Executive Vice President of Dealer Sales and Services, respectively.[14]

In addition to Perry, Defendants Abhishek Agrawal, Robert Buce, Christopher Claus, Steven Dietz, John Krafcik, Erin Lantz, John Mendel, Wesley Nichols, and Ion Yadigaroglu are current or former members of TrueCar's Board.

Agrawal served on the Board from November 2013 through May 18, 2017, and served as Managing Director and Global Head of Growth Equity at Vulcan and on the Investment Advisory Board of one of the Capricorn entities.[15]  Mendel replaced Agrawal on the Board in May 2017.[16]

Claus has served on the Board since April 2014 and as Chairman of the Board since February 2016.[17]  Before joining TrueCar's Board, Claus served in various

---

[12] *Id.* ¶ 27.

[13] *Id.* ¶ 26.

[14] *Id.* ¶¶ 34-36.

[15] *Id.* ¶ 29.

[16] *Id.* ¶ 40.

[17] *Id.* ¶ 37.

senior executive positions at USAA for over 20 years.[18] Claus also served since January 2009 as a director of USAA Real Estate Company, "the real estate investment arm of USAA."[19]

Dietz served on the Board from February 2006 until his resignation in October 2018 and "managed" Upfront.[20] Nichols has served on the Board since November 2016 and "advised" Upfront.[21]

Buce, Krafcik, Lantz, and Yadigaroglu have served on the Board since April 2005, February 2014, November 2016, and August 2007, respectively.[22] Yadigaroglu has been Managing Principal at one of the Capricorn entities since 2004.[23]

This opinion refers, at times, to the fifteen current and former directors and officers named as defendants, collectively, as the "Individual Defendants"; to Guthrie, Pierantoni, Agrawal, Buce, Dietz, Krafcik, Yadigaroglu, Gunsagar, Swart, and Skutta as the "Individual Selling Defendants"; to USAA, Upfront, Capricorn,

---

[18] *Id.*

[19] *Id.*

[20] *Id.* ¶¶ 31, 42.

[21] *Id.* ¶¶ 39, 42.

[22] *Id.* ¶¶ 30, 32, 38.

[23] *Id.* ¶¶ 33, 42.

and Vulcan, collectively, as the "Entity Defendants"; and to all defendants, collectively, as "Defendants."

### B. TrueCar's Partnership with USAA and the February Meeting

TrueCar's financial success depends on its ability to draw consumers to its car-buying platform, which leads to sales of cars, referred to as "units."[24]  The majority of TrueCar's unit sales are through its "affinity group marketing partners."[25]  TrueCar's most important and longest standing affinity partner is USAA.[26]

As part of its partnership with USAA, TrueCar hosted a co-branded website only accessible to USAA members, which was the "largest source of user traffic and unit sales from [TrueCar's] affinity group marketing partners" in 2016.[27]  More specifically, the website generated 32% of TrueCar's annual unit sales and 45% of its total contribution profit in 2016.[28]  TrueCar was responsible for maintaining the

---

[24] *Id.* ¶ 76.

[25] *Id.* ¶ 77.

[26] *Id.* ¶¶ 78, 81.

[27] *Id.* ¶¶ 92, 94.

[28] *Id.* ¶¶ 81, 94.

website but USAA had "broad discretion" to determine how the website was "promoted and marketed" to its members.[29]

In early 2015, Stuart Parker became USAA's CEO.[30] In this role, Parker sought to make USAA a more "advice-centric organization" and suggested that USAA members might be encouraged to delay purchasing vehicles to improve their financial health.[31] Consistent with this new direction, USAA notified TrueCar in or around January 2017 that it was redesigning the co-branded website.[32] The redesign added several steps before USAA members could access the TrueCar platform, including a series of questions concerning personal and financial information and warnings about the cost of car ownership.[33] These changes would take several months to implement and were expected to be fully implemented by June 2017.[34]

On February 9, 2017, all but two of the fifteen Individual Defendants attended a meeting of the Board.[35] At this meeting, the attendees discussed TrueCar's

---

[29] *Id.* ¶¶ 82-84.

[30] *Id.* ¶ 88.

[31] *Id.* ¶ 89.

[32] *Id.* ¶ 91.

[33] *Id.* ¶¶ 91, 92, 122, 141, 156.

[34] *Id.* ¶ 92.

[35] *Id.* ¶ 94.

"ongoing efforts [to] enhance the relationship with USAA."[36]  A presentation to the Board stated that the Company had a goal to "re-energize" the relationship with USAA to "continue growth" and included a slide identifying "USAA underperformance" among a list of TrueCar's top risks for 2017.[37]  The meeting materials also included a "2017 Financial Model," which forecasted year-over-year quarterly growth in 2017, and USAA year-over-year unit growth of 15%, 12%, 11%, and 10% over the next four quarters.[38]

On February 16, 2017, TrueCar issued a press release announcing its financial results for the fourth quarter and year-end 2016.[39]  In the press release, Perry stated that TrueCar was "re-accelerating [its] top-line growth" and would "continue to drive double-digit rates of unit and revenue growth for some time."[40]  That same day, Perry and Guthrie reiterated their expectations on an earnings call and Guthrie stated that USAA units were at "an all-time high."[41]

---

[36] *Id.*

[37] *Id.*

[38] *Id.* ¶ 95; German Aff. Ex. 2 ("February 2017 Board Presentation"), at 58 (Dkt. 31).

[39] Compl. ¶ 97.

[40] *Id.*

[41] *Id.* ¶¶ 98-99.

On March 1, 2017, TrueCar filed its 2016 Form 10-K with the SEC.[42] All members of the Board at the time and officers Guthrie and Pierantoni signed the 2016 Form 10-K.[43] It included various disclosures concerning USAA and the website and its potential to negatively impact TrueCar's business:

> USAA has broad discretion in how the car-buying site we maintain for USAA is promoted and marketed on its own website. Changes in this promotion and marketing have in the past and may in the future adversely affect the volume of user traffic we receive from USAA. Changes in our relationship with USAA or its promotion and marketing of our platform could adversely affect our business and operating results in the future.[44]

According to the Complaint, the Form 10-K also explained that "a significant reduction in the number of cars purchased . . . by members of [TrueCar's] affinity group marketing partners would reduce [the Company's] revenue and harm [TrueCar's] operating results" and that TrueCar's relationship with affinity groups "might change" in which case its "operating results and prospects may be harmed."[45]

---

[42] *Id.* ¶ 104.

[43] *Id.*

[44] *Id.* ¶ 106 (emphasis omitted).

[45] *Id.* ¶¶ 104-05 (alterations in original).

10

## C. The Secondary Offering and the Website Redesign

On April 17, 2017, the Board approved a resolution authorizing a secondary offering of TrueCar stock, defined above as the "Secondary Offering."[46] As part of the Secondary Offering, TrueCar's officers, directors, and affiliates, agreed to a 90-day "Lock-Up Period," which prevented them from selling any TrueCar stock until after the Lock-Up expired on July 25, 2017.[47]

The Secondary Offering was conducted pursuant to a shelf registration filed with the SEC, dated January 19, 2017; a Prospectus filed with the SEC, dated January 19, 2017; and a Prospectus Supplement filed with the SEC, dated April 26, 2017.[48] This opinion refers to these documents collectively as the "Secondary Offering Documents."

On April 26, 2017, TrueCar conducted the Secondary Offering of 10.35 million shares for $16.50 per share.[49] The Entity Defendants received approximately 64% of the proceeds, totaling approximately $110 million.[50] From and including the Secondary Offering until October 16, 2017, the Entity Defendants

---

[46] *Id.* ¶ 108.

[47] *Id.* ¶¶ 114-15.

[48] *Id.* ¶ 8 n.2.

[49] *Id.* ¶ 112.

[50] *Id.*

and the Individual Selling Defendants sold approximately 8 million shares of TrueCar stock, generating over $135 million in proceeds.[51]

On May 3, 2017, after the Secondary Offering closed, the Audit Committee consisting of Buce, Claus, Guthrie, Lantz, and Pierantoni met to discuss "changes to the Company's risk factors in its SEC filings. . . . [and] approved filing the Form 10-Q without updating the risk disclosure regarding USAA."[52] On May 9, 2020, during an earnings call with investors, Guthrie highlighted USAA's "healthy [unit] growth of 16% in the first quarter."[53] The next day, TrueCar filed its Form 10-Q, which repeated the same disclosures set forth in the Company's 2016 Form 10-K regarding the relationship with USAA and the website.[54]

On June 1, 2017, USAA's website redesign was implemented.[55] USAA members described the newly designed website as "a nightmare to use" and the changes "caused [USAA members] to pause, perhaps not continue, perhaps come back at a later date."[56]

---

[51] *Id.* ¶ 176.

[52] *Id.* ¶ 117 (emphasis omitted).

[53] *Id.* ¶¶ 119-20.

[54] *Id.* ¶ 118.

[55] *Id.* ¶¶ 122, 157.

[56] *Id.* ¶¶ 141, 147, 195.

On July 26, 2017—the day after the Lock-Up Period expired—certain officers of TrueCar began selling shares of TrueCar stock:

- On July 26, Swart and Pierantoni sold over $690,000 and $1.1 million worth of TrueCar stock, respectively;

- On July 26 and July 27, Gunsagar sold over $3 million worth of TrueCar stock; and

- Over the week after the Lock-Up Period expired, Guthrie sold over $13.9 million worth of TrueCar stock.[57]

On July 27, 2017, during a Board meeting, Perry explained to the Board that "[t]he partner business is driving lots of growth . . . USAA, however, is a fragile relationship and needs more attention."[58] Included in the Board meeting materials was a presentation that explained that USAA had made a minor change to its website in late 2016, which had resulted in an "11% decrease in total new car search visitors" and a loss of USAA new car traffic.[59]

On August 8, 2017, the Company released its second quarter results.[60] During an earnings call that same day, Guthrie told investors that TrueCar was currently seeing "continued strong growth in units" in the third quarter that was "really

---

[57] *Id.* ¶¶ 115, 127, 176.

[58] *Id.* ¶ 129 (emphasis omitted).

[59] *Id.* ¶ 130 (emphasis omitted).

[60] *Id.* ¶ 132.

fantastic."[61] Guthrie also stated that TrueCar expected "Q3 units to be in the range of . . . 20% to 22% year-over-year growth."[62]

On August 9, 2017, TrueCar filed a Form 10-Q for the second quarter of 2017, which was approved by the Audit Committee on August 3.[63] It continued to warn of the "risk" that if USAA were to change the website "in the future," its business would be significantly harmed.[64]

### D.     The Website Redesign Negatively Impacts TrueCar

On September 15, 2017, the Board held a special meeting at which it was advised that "preliminary August results indicate[d] below guidance performance" and "USAA [unit] performance [was] significantly affected in Q3 2017," resulting in $1.8 million in lost USAA revenue for the quarter.[65] The same day as the special Board meeting, officers Pierantoni and Gunsagar sold more than 20,000 shares of their TrueCar stock, generating over $300,000 in proceeds.[66]

---

[61] *Id.* ¶ 134.

[62] *Id.*

[63] *Id.* ¶ 132.

[64] *Id.* ¶¶ 132-33.

[65] *Id.* ¶¶ 137-38.

[66] *Id.* ¶ 140.

On October 26, 2017, the Board held a meeting where it again was advised that USAA struggled in the third quarter and the website changes had "significantly impacted USAA's performance."[67]

On November 6, 2017, TrueCar issued a press release announcing that the Company sustained a $9.5 million net loss for the third quarter and was lowering its guidance.[68] On an earnings call that day, Perry and Guthrie disclosed that USAA units had declined by 5%.[69] Guthrie disclosed that "[t]he year-over-year contraction in units at USAA contributed to the deceleration in used car growth versus last quarter as our USAA channel has the highest ratio of used car sales."[70] He also told investors that TrueCar's "unique visitors" growth rate had fallen to 1%—the slowest growth rate since 2013.[71] During the earnings call, Perry stated that "we saw these [changes] coming. It wasn't like we were blind to them," and Guthrie assured investors that TrueCar "work[s] with [USAA] on a daily basis and we're well-connected."[72]

---

[67] *Id.* ¶ 141.

[68] *Id.* ¶¶ 143-44.

[69] *Id.* ¶¶ 144.

[70] *Id.* ¶¶ 145.

[71] *Id.*

[72] *Id.* ¶¶ 149, 152.

15

On November 7, 2017, TrueCar's stock fell over 35%.[73] On January 28, 2018, Guthrie resigned as CFO.[74] On February 15, 2018, TrueCar announced its fourth quarter and full year results for 2017.[75] TrueCar's affinity partnership with USAA produced 58,975 units, down 14% from the prior year.[76]

## E. The Securities Class Action

On March 30, 2018, a securities class action was filed in the United States District Court for the Central District of California against TrueCar and eleven of the fifteen Individual Defendants in this action: Guthrie, Perry, Pierantoni, Agrawal, Buce, Claus, Dietz, Krafcik, Lantz, Nichols, and Yadigaroglu (the "Securities Class Action").[77] The complaint in that action asserted various claims under the Securities Act and the Exchange Act based on TrueCar's public disclosures concerning USAA and its prospects for 2017. This opinion refers to the defendants in the Securities Class Action as the "Securities Class Action Defendants."

---

[73] *Id.* ¶ 154.

[74] *Id.* ¶¶ 26, 158.

[75] *Id.* ¶ 159.

[76] *Id.*

[77] *Id.* ¶¶ 26-33, 37-39, 178-79.

16

On February 5, 2019, the district court in the Securities Class Action denied the defendants' motion to dismiss the complaint in a two-paragraph order.[78] On August 2, 2019, the parties in the Securities Class Action executed a Stipulation and Agreement of Settlement (the "Settlement Agreement") to fully and finally resolve the case.[79] The district court preliminarily approved the settlement on October 15, 2019, and granted final approval on January 27, 2020.[80]

## II.   PROCEDURAL HISTORY

Beginning on August 22, 2019, Plaintiffs filed three separate actions in this court against the Defendants after seeking books and records under 8 *Del. C.* § 220.[81] Those actions were consolidated on October 9, 2019, and Plaintiffs filed a consolidated complaint (as defined above, the "Complaint") on November 7, 2019.[82]

The Complaint asserts four counts derivatively on behalf of TrueCar. Count I asserts essentially two distinct claims for breach of fiduciary duty against different sets of defendants.

---

[78] *Id.* ¶ 179.

[79] *Id.* ¶ 181; German Decl. Ex. 11 ("Preliminary Approval Order"), at 2 (Dkt. 31).

[80] Preliminary Approval Order; Uebler Aff. Ex. A ("Final Approval Order") (Dkt. 48); German Decl. Ex. 25 ("Settlement Agreement") (Dkt. 58).

[81] *See* Dkt. 5; Compl. ¶ 15.

[82] Dkt. 5; Dkt. 16.

The first claim within Count I is asserted against the Individual Defendants for:

> (i) failing to disclose the truth about the impending material changes to the USAA co-branded website and its expected negative impact on the Company's financial performance; (ii) making or failing to correct false and misleading statements and omissions regarding the same; (iii) allowing the [Individual Selling Defendants and USAA] to engage in the sale of stock based on insider information; and/or (iv) failing to provide adequate oversight of the Company to prevent any of the above.[83]

This claim is referred to herein as the "Disclosure Claim" and the fourth part of the claim is referred to as the "*Caremark*" claim.

The second claim within Count I is asserted against the Individual Selling Defendants and USAA under *Brophy v. Cities Service Company*[84] for possessing "material, adverse, nonpublic information regarding the impending material changes to the USAA site and the expected significant negative impact, and ma[king] stock sales . . . on the basis of that information while the price of the Company's shares was artificially inflated."[85] Plaintiffs seek restitution and disgorgement of profits for

---

[83] Compl. ¶ 205. Although this part of Count I also is asserted against USAA, Plaintiffs did not address the alleged Disclosure Claim or the *Caremark* claim against USAA in their brief and thus waived these issues. *See* USAA Reply Br. 5 n.2. *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[84] 70 A.2d 5 (Del. Ch. 1949).

[85] Compl. ¶¶ 206.

this claim.[86] This claim overlaps with Count II, which asserts a claim for unjust enrichment against the Individual Selling Defendants and USAA for selling "TrueCar stock while in possession of material, nonpublic information that artificially inflated the price of TrueCar stock."[87]

Count III seeks contribution and indemnification on behalf of the Company from the Securities Class Action Defendants for "expos[ing] the Company to significant liability under various federal and state laws."[88]

Count IV asserts an aiding and abetting claim against the Entity Defendants for "knowingly participat[ing]" in breaches of fiduciary duty by Agrawal, Claus, Dietz, Nichols and Yadigaroglu for "selling shares motivated in whole or in part by material adverse inside information" the fiduciaries shared with them.[89] Count IV is asserted against USAA in the alternative to Count I, to the extent USAA does not owe fiduciary obligations to TrueCar.[90]

---

[86] *Id.* ¶ 211.

[87] *Id.* ¶¶ 215-16.

[88] *Id.* ¶¶ 219-22.

[89] *Id.* ¶¶ 223-32.

[90] *Id.* at 112 n.15.

On December 19, 2019, each of the Defendants moved to dismiss the Complaint.[91] After briefing, the court heard oral argument on June 11, 2020.[92]

## III. ANALYSIS

The Individual Defendants and USAA have moved to dismiss the Complaint under Court of Chancery Rule 23.1 for failure to plead demand futility and all Defendants have moved under Rule 12(b)(6) to dismiss the Complaint for failure to state a claim for relief against each of them.

Although it would be typical to analyze first whether Plaintiffs' failure to make a demand should be excused, Defendants' motions raise a host of subsidiary issues that impact the Rule 23.1 analysis. In order to streamline that analysis, the court will consider first two of those subsidiary issues, namely (i) whether USAA owed fiduciary duties to TrueCar and (ii) whether the sales of stock by certain Entity Defendants (Capricorn, Upfront, and USAA) should be attributed to certain directors on the Demand Board who allegedly were affiliated with those entities. These issues are addressed in Sections A and B below. The court then will consider whether Plaintiffs have plead particularized facts sufficient to show that making a demand on the TrueCar Board before filing their primary derivative claims would have been

---

[91] Dkt. 27 (USAA Mot.); Dkt. 28 (Entity Defs.' Mot.); Dkt. 31 (Individual Defs.' Mot.).

[92] Dkt. 71.

20

futile. This issue is discussed in Sections C-E below. Finally, the court will consider whether Count III states a claim for relief in Section F below.

## A. Whether USAA Owed Fiduciary Duties

Plaintiffs assert a *Brophy* claim against USAA and, in the alternative, an aiding and abetting claim against USAA "solely to the extent USAA is found not to have owed fiduciary obligations to TrueCar."[93] To state a claim under *Brophy*, a plaintiff must allege that, "1) the corporate fiduciary possessed material, nonpublic company information; and 2) the corporate fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance of that information."[94]

USAA has moved to dismiss the *Brophy* claim for failure to state a claim for relief on the ground that USAA is not a fiduciary of TrueCar.[95] The standards governing a motion to dismiss under Rule 12(b)(6) for failure to state a claim for relief are well-settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and [(iv)] dismissal is inappropriate

---

[93] Compl. at 112 n.15.

[94] *In re Oracle Corp. Deriv. Litig.*, 867 A.2d 904, 934 (Del. Ch. 2004).

[95] USAA Opening Br. at 13 (Dkt. 27).

21

unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[96]

Plaintiffs allege USAA owed fiduciary obligations to TrueCar because of its "significant TrueCar stockholdings which they have maintained since TrueCar's inception, representation on TrueCar's Board via its designee (Defendant Claus) as Board Chairman and attendant observation rights, and control over TrueCar via the contractual Services Agreement and its substantial contribution to TrueCar's revenues and profits as TrueCar's most significant affinity partner."[97]

Citing this court's 1973 decision in *Cheese Shop International, Inc. v. Steele*,[98] Plaintiffs assert that USAA "occupied a special position of trust and confidence analogous to that of a fiduciary."[99] Although a venerable decision for its articulation of the attributes that generally define a fiduciary relationship, *Cheese Shop* does not address the specific circumstances under which our law imposes fiduciary duties on a stockholder of a corporation. A long line of Delaware precedent addresses that

---

[96] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (internal quotations and citations omitted).

[97] Compl. ¶ 204.

[98] 303 A.2d 689, 690 (Del. Ch. 1973) (finding that a licensee under a license agreement did not owe fiduciary duties to the licensor), *rev'd on other grounds*, 311 A.2d 870 (Del. 1973).

[99] Pls.' Answering Br. at 73-75 (Dkt. 47).

precise issue. That precedent, which Plaintiffs relegate to a conclusory footnote in their brief, provides the operative standards to apply here.[100]

It is well-settled under Delaware law that a stockholder owes fiduciary duties when "the stockholder (1) owns more than 50% of the voting power of a corporation or (2) owns less than 50% of the voting power of the corporation but '*exercises control* over the business affairs of the corporation.'"[101] As of January 2017, USAA held 14% of TrueCar's outstanding stock.[102] The test for minority stockholders to be deemed a controller "is not easy to satisfy, and can only be met where stockholders who, although lacking a clear majority, have such formidable voting and managerial power that they, as a practical matter, are no differently situated than if they had majority voting control."[103]

Here, the Complaint does not allege sufficient facts to show that USAA exercised control over the business affairs of the corporation or that any director was controlled by or beholden to USAA. USAA contends that Claus served as USAA's

---

[100] *See id.* at 76 n.26.

[101] *In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 991 (Del. Ch. 2014) (citing *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1113-14 (Del. 1994) (quoting *Ivanhoe P'rs v. Newmont Mining Corp.*, 535 A.2d 1334, 1344 (Del. 1987)), *aff'd sub nom. Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304 (Del. 2015).

[102] Compl. ¶ 41.

[103] *In re KKR*, 101 A.3d at 992 (internal quotation marks and citations omitted).

"representative" on the Board, but the court finds for the reasons explained in Part III.E below that the Complaint does not plead facts sufficient to create a reasonable doubt about Claus's independence from USAA.

Although USAA has been TrueCar's largest stockholder and most important affinity partner since the Company's inception,[104] USAA maintained a commercial relationship with TrueCar, documented in a Services Agreement that delineated the companies' respective rights and obligations, similar to that of TrueCar's other affinity partners.[105] Absent from the Complaint are any allegations that the Services Agreement granted USAA the power to restrict TrueCar's Board or provided USAA such formidable managerial power so as to control TrueCar's business affairs. In short, the Complaint does not allege any facts to suggest that USAA had anything other than a significant commercial relationship with TrueCar during the period relevant to this action. This does not give rise to fiduciary duty obligations.[106]

Because it is not reasonably conceivable from the allegations in the Complaint that USAA owes fiduciary obligations to TrueCar, the *Brophy* claim against USAA

---

[104] *See* Compl. ¶¶ 79-82.

[105] *See id.* ¶¶ 83-84; Mot. to Dismiss Hr'g Tr. ("Tr.") at 80-81 (June 11, 2020) (Dkt. 72).

[106] *In re Delta & Pine Land Co. S'holders Litig.*, 2000 WL 875421, at *7 (Del. Ch. June 21, 2000) ("To assert that contractual relationships necessarily cause one contracting party to control the other is an unsupported exaggeration. If this were so, customers and suppliers would control every existing company.").

will be dismissed. The court will address Plaintiffs' alternative aiding and abetting claim against USAA in the next section.

### B. Whether the Stock Sales of USAA, Upfront, and Capricorn are Attributable to Members of the Demand Board

When Plaintiffs filed their initial complaint, the Board consisted of eight members: Buce, Claus, Krafcik, Lantz, Nichols, Yadigaroglu, Mendel, and non-party McKoy (collectively, the "Demand Board").[107] The Complaint alleges that five of these individuals (Buce, Claus, Krafcik, Nichols, and Yadigaroglu) engaged in insider selling in breach of their fiduciary duties.[108] The Complaint does not allege that Claus, Nichols, or Yadigaroglu sold any shares of TrueCar stock they held personally at any time relevant to this action.[109] Plaintiffs argue nevertheless that stock sales made by USAA, Upfront, and Capricorn should be attributed to Claus, Nichols, and Yadigaroglu, respectively,[110] under this court's decision in *In re Fitbit, Inc. Stockholder Derivative Litigation*.[111]

---

[107] Compl. ¶ 192.

[108] *Id.* ¶¶ 206-10, 225.

[109] *See id.* ¶¶ 33, 37, 39, 169, 176, 226.

[110] Pls.' Answering Br. at 51-52, 88.

[111] 2018 WL 6587159 (Del. Ch. Dec. 14, 2018).

In *Fitbit*, the court considered "whether a fiduciary may be held liable on a *Brophy* claim for trades that an entity or fund associated with that fiduciary executed in its name."[112]  In finding that a fiduciary could be liable in these circumstances, Vice Chancellor Slights explained as follows:

> Here, the Selling Defendants seek a ruling that would permit a director to trade on inside material information without consequence just because the director did not trade personally but rather passed the information to an entity with which he is affiliated (*and over which he exercised control*) to do the trading. That is not and cannot be our law. Indeed, to allow these directors, through their *controlled* funds, to profit from inside information without recourse would be inconsistent with the policy of extinguishing all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation that undergirds Delaware's insider trading law.[113]

Applying this principle, the court found that plaintiffs had pled particularized facts concerning two directors who "share voting and dispositive power over the Fitbit stock owned by their respective funds" to allow a reasonable inference at the pleadings stage that they "personally and materially profited from the challenged stock sales through their ownership and control of their affiliated funds."[114]  Here, the Complaint fails to plead any facts to warrant attributing the stock sales of USAA

---

[112] *Id.* at *13.

[113] *Id.* at *13-14 (internal quotation marks and citations omitted) (emphasis added).

[114] *Id.* at *14.

26

and Upfront to Claus and Nichols, respectively, but does allege sufficient facts to attribute Capricorn's stock sales to Yadigaroglu at the pleadings stage.

Starting with Claus, the Complaint is devoid of any facts connecting him to the USAA entities that sold stock in the Secondary Offering when those sales occurred. In fact, Claus left his employment at USAA in 2014, over three years before USAA sold shares in the Secondary Offering, and although Claus sat on the board of a related USAA entity, that entity is not alleged to have sold any stock at any time relevant to this action.[115] Because USAA's sales cannot be attributed to Claus, Plaintiffs cannot state a claim for breach of the fiduciary duty of loyalty for insider trading against him.[116] Thus, the aiding and abetting claim against USAA, which is predicated on a claim for insider trading against Claus, will be dismissed for failure to state a claim for an underlying breach.

With respect to Nichols, the Complaint similarly does not allege *any* facts regarding the advisory role Nichols played at Upfront or allege that Nichols

---

[115] Compl. ¶¶ 37, 41, 80.

[116] Count I of the Complaint, which asserts a *Brophy* claim against the "Individual Selling Defendants," does not apply to Claus by its terms because he was not included in the definition of the term "Individual Selling Defendants." *See id.* ¶¶ 45, 209. The aiding and abetting claim in Count IV of the Complaint nevertheless asserts that Claus breached his fiduciary duty of loyalty by engaging in insider trading. *Id.* ¶ 225.

exercised *any* control over Upfront's investment in TrueCar.[117] Consistent with this, the Complaint notably does not contain any demand futility allegations regarding Upfront's sales being attributable to Nichols.[118]

In contrast to USAA and Upfront, the Complaint specifically alleges that "[v]oting and dispositive decisions on behalf of Capricorn were made by an investment committee consisting of four individuals, including Yadigaroglu."[119] This allegation is sufficient at the pleadings stage to attribute Capricorn's sales to Yadigaroglu under *Brophy* based on the reasoning in *Fitbit*, where the court attributed stock sales to two directors who *shared* "voting and dispositive power over the Fitbit stock owned by their respective funds."[120]

## C.    The Demand Requirement

Under Court of Chancery Rule 23.1, a stockholder who wishes to bring a derivative claim on behalf of a corporation must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the

---

[117] *See id.* ¶¶ 39, 42, 164-76.

[118] *See id.* ¶ 197.  Although the court does not need to address the issue given its conclusions on the issue of demand futility, plaintiffs assert a *Brophy* claim against another director (Dietz), who is not a member of the Demand Board, on the theory that Upfront's sales may be attributed to him.  *See id.* ¶¶ 206-09, 226.

[119] *Id.* ¶¶ 227; *id.* ¶ 169 n.13; German Aff. Ex. 18 (Prospectus Supplement on Form 424B5, filed with the SEC on April 27, 2017), at S-48.

[120] *Fitbit*, 2018 WL 6587159, at *14.

directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort."[121] This requirement stems from a "basic principle of the Delaware General Corporation Law . . . that the directors, and not the stockholders, manage the business and affairs of the corporation."[122]

"The decision to bring or to refrain from bringing suit on behalf of the corporation is the responsibility of the board of directors."[123] This allows "a corporation, on whose behalf a derivative suit is brought, the opportunity to rectify the alleged wrong without suit or to control any litigation brought for its benefit."[124] Under the heightened pleading requirements of Rule 23.1, "conclusionary allegations of fact or law not supported by the allegations of specific fact may not be taken as true."[125]

---

[121] Ch. Ct. R. 23.1.

[122] *FLI Deep Marine LLC v. McKim*, 2009 WL 1204363, at *2 (Del. Ch. Apr. 21, 2009).

[123] *Id.*

[124] *Lewis v. Aronson*, 466 A.2d 375, 380 (Del. Ch. 1983), *rev'd on other grounds*, 473 A.2d 805 (Del. 1984).

[125] *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

This court employs two different tests for determining whether demand may be excused under Delaware law:  the *Aronson* test and the *Rales* test.[126]  The court applies the test from *Aronson v. Lewis*[127] when "a *decision* of the board of directors is being challenged in the derivative suit."[128]  On the other hand, *Rales v. Blasband*[129] governs when "the board that would be considering the demand did not make a business decision which is being challenged in the derivative suit," such as "where directors are sued derivatively because they have failed to do something."[130]  Under either test, a plaintiff "must impugn the ability of at least half the directors in office when [plaintiff] initiated [its] action . . . to have considered a demand impartially."[131]

---

[126] Both tests ultimately focus on the same inquiry, *i.e.*, whether "the derivative plaintiff has shown some reason to doubt that the board will exercise its discretion impartially and in good faith." *In re INFOUSA, Inc. S'holders Litig.*, 953 A.2d 963, 986 (Del. Ch. 2007).

[127] 473 A.2d at 810 (the court asks "whether, under the particularized facts alleged, a reasonable doubt is created that:  (1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment.").

[128] *Rales v. Blasband*, 634 A.2d 927, 933 (Del. 1993).

[129] *Id.* at 934 ("a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand.").

[130] *Id.* at 933-34, 934 n.9.  *Rales* also applies "where a business decision was made by the board of a company, but a majority of the directors making the decision have been replaced" and where "the decision being challenged was made by the board of a different corporation." *Id.* at 934.

[131] *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 57 (Del. Ch. 2015) (citation omitted).

30

To do so, a plaintiff must allege a "constellation of facts that, taken together, create a reasonable doubt about [the director]'s ability to objectively consider a demand."[132]

As discussed above, the Demand Board consisted of eight members: Buce, Claus, Krafcik, Lantz, Nichols, Yadigaroglu, Mendel, and non-party McKoy.[133] Plaintiffs do not challenge McKoy's impartiality.[134] Thus, the question before the court is whether Plaintiffs have plead with particularity sufficient facts to create a reasonable doubt about the disinterestedness or independence of four of the other seven members of the Demand Board so as to impugn the ability of a majority of the Demand Board to consider a demand impartially as to each claim.

Plaintiffs primarily argue that demand is excused because at least four directors on the Demand Board face a substantial likelihood of liability with respect to the claims asserted in the Complaint. To establish a substantial likelihood of liability at the pleading stage, a plaintiff must "make a threshold showing, through the allegation of particularized facts, that their claims have some merit."[135]

---

[132] *In re Oracle Corp. Deriv. Litig.*, 2018 WL 1381331, at *18 (Del. Ch. Mar. 19, 2018).

[133] Compl. ¶ 192.

[134] *Rales*, 634 A.2d at 930.

[135] *Rales*, 634 A.2d at 934.

TrueCar's certificate of incorporation contains a provision exculpating its directors for breaches of the duty of care, as permitted under Section 102(b)(7) of the Delaware General Corporation Law.[136] Thus, to demonstrate that directors on the Demand Board face a substantial likelihood of liability with respect to the claims asserted against them, Plaintiffs must allege with particularity facts demonstrating there is some merit to a claim for breach of the duty of loyalty. As discussed next, Plaintiffs' lead argument is that six of the eight directors on the Demand Board acted in bad faith, *i.e.*, that they "intentionally fail[ed] to act in the face of a known duty to act, demonstrating a conscious disregard for [their] duties."[137]

## D.     Whether Demand is Excused as to the Disclosure Claim

The Complaint challenges the accuracy of certain statements that TrueCar officers made in press releases and during earnings calls at various times in 2017. By contrast, the only disclosures Plaintiffs challenge in which directors on the Demand Board are alleged to have "directly participated" consists of three statements in the "risk factors" section of TrueCar's 2016 Form 10-K (the

---

[136] German Aff., Ex. 12 (TrueCar's Certificate of Incorporation) § 8.1; *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 239 (Del. 2009).

[137] *Lyondell*, 970 A.2d at 243 (citation and internal quotations omitted).

"Challenged Statements"), which were repeated in the Secondary Offering Documents. As stated in Plaintiffs' brief:

> The Demand Defendants themselves directly participated in the subterfuge by signing TrueCar 2016 Form 10-K, which misleadingly represented [i] that TrueCar's "relationship with affinity groups *might change*," [ii] that those partners "*might de-emphasize* the automobile buying programs within their offerings," and [iii] that changes in USAA's promotion and marketing on its own website "*may in the future* adversely affect the volume of user traffic" received from USAA, when the Demand Board already knew those risks were certain to come to pass.[138]

The risk factors section in Item 1A of TrueCar's 2016 Form 10-K is approximately twenty pages long.[139] The first two statements quoted above come from the part of the risk factors section discussing TrueCar's affinity group marketing partners generally.[140] The third statement comes from the part discussing TrueCar's relationship with USAA specifically.[141]

Plaintiffs advance essentially three arguments why a majority of the Demand Board faces a substantial likelihood of liability with respect to the Challenged

---

[138] Pls.' Answering Br. 34 (emphasis in original). *See also* Compl. ¶¶ 104-07.

[139] TrueCar Form 10-K filed with the SEC on March 1, 2017, at 9-30. *See In re General Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170 (Del. 2006) (permitting the court to take judicial notice of "hearsay in SEC filings" that is not subject to reasonable dispute) (internal quotation marks, alterations, and citations omitted).

[140] German Aff. Ex. 1 (Excerpts of TrueCar's 2016 Form 10-K), at 14-15.

[141] *Id.* at 15.

Statements, *i.e.*, (i) they failed to correct these statements even though they allegedly knew about changes USAA was planning to make to its website several months before the changes were implemented in June 2017; (ii) in the alternative, they breached their oversight duties under *In re Caremark Int'l Inc. Derivative Litigation*;[142] and (iii) they were conflicted due to the Securities Class Action. The court discusses each of these arguments, in turn, below.

### 1. The Demand Board's State of Knowledge About the USAA Website Redesign

"Whenever directors communicate publicly or directly with shareholders about the corporation's affairs, with or without a request for shareholder action, directors have a fiduciary duty to shareholders to exercise due care, good faith and loyalty."[143] To plead a disclosure claim when there is no request for stockholder action, as is the case here, a plaintiff must allege that the directors "deliberately misinform[ed] shareholders about the business of the corporation, either directly or by a public statement."[144] "[D]irectors who knowingly disseminate false information that results in corporate injury . . . violate their fiduciary duty . . . ."[145]

---

[142] 698 A.2d 959 (Del. Ch. 1996).

[143] *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998).

[144] *Id.* at 14.

[145] *Id.* at 9; *see also In re INFOUSA, Inc. S'holders Litig.*, 953 A.2d 963, 990 (Del. Ch. 2007) ("When a Delaware corporation communicates with its shareholders, even in the

34

"A determination of whether the alleged misleading statements or omissions were made with knowledge or in bad faith requires an analysis of the state of mind of the individual director defendants."[146] Thus, to adequately allege that a director faces a substantial likelihood of liability for disclosure violations, the plaintiff must plead specific factual allegations showing "that the director defendants had knowledge that any disclosures or omissions were false or misleading."[147]

With respect to disclosures that appear in "annual reports and other publicly filed financial reports," our Supreme Court has held that the "Board's execution of [the company's] financial reports, without more, is insufficient to create an inference that the directors had actual or constructive notice of any illegality."[148] This is

---

absence of a request for shareholder action, shareholders are entitled to honest communication from directors, given with complete candor and in good faith. Communications that depart from this expectation, particularly where it can be shown that the directors involved issued their communication with the knowledge that it was deceptive or incomplete, violate the fiduciary duties that protect shareholders. Such violations are sufficient to subject directors to liability in a derivative claim.").

[146] *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 134 (Del. Ch. 2009).

[147] *Id.*

[148] *Wood v. Baum*, 953 A.2d 136, 142 (Del. 2008) (citing *Guttman v. Huang*, 823 A.2d 492, 498 (Del. Ch. 2003) (Strine, V.C.) (dismissing complaint that was "devoid of any pleading regarding the full board's involvement in the preparation and approval of the company's financial statements" and of "particularized allegations of fact demonstrating that the outside directors had actual or constructive notice of the accounting improprieties."); *see id.* ("We conclude that the Court of Chancery correctly applied Delaware law in declining to infer from the Board's approval either that (i) each member of the Board knew that the alleged transactions were improper or that (ii) the Board consciously and in bad faith failed to discharge fiduciary or contractual responsibilities with respect to those transactions.").

because, without "particularized facts to connect the board" to the challenged statements, "there is reason to doubt that the board knew that the statements were false or misleading or acted in bad faith by not adequately informing themselves about the statements."[149] Thus, in determining whether *scienter* has been sufficiently plead, the court looks for allegations demonstrating "sufficient board involvement in the preparation of the disclosures" or that the director defendants "were otherwise responsible for" the disclosures.[150]

The Complaint alleges that by "early 2017, USAA informed TrueCar that it would significantly redesign the co-branded car-buying site, and that the changes

---

[149] *In re Dow Chem. Co. Deriv. Litig.*, 2010 WL 66769, at *11 (Del. Ch. Jan. 11, 2010). *See also Steinberg on behalf of Hortonworks, Inc. v. Bearden*, 2018 WL 2434558, at *10 (Del. Ch. May 30, 2018) (holding that although a director who signed a SOX certification for a Form 10–Q was differently situated from the other directors who were not alleged to have played any specific role concerning the inclusion of disclosures in the Form 10–Q, none faced a substantial likelihood of liability because plaintiffs had failed to allege *scienter*); *Ellis v. Gonzalez*, 2018 WL 3360816, at *10 (Del. Ch. July 10, 2018) (plaintiffs failed to establish a substantial likelihood of liability for the disclosures because "[t]he Complaint fails to plead any particularized facts supporting a reasonable inference that the Director Defendants *knew* about the September 29 letters—much less that they signed off on them") (emphasis added); *In re China Auto. Sys. Inc. Deriv. Litig.*, 2013 WL 4672059, at *8 (Del. Ch. Aug. 30, 2013) (plaintiffs alleged that "all five directors attested to the misleading financial statements by signing one of the SEC filings at issue," but did "not allege with particularity any direct or personal involvement . . . in the Company's preparation of its financial statements, in the Board's or Audit Committee's review of SLF's auditing of the financial statements, or in any other capacity by which the Court could reasonably infer that a majority of the Defendants had any *knowledge* that their actions or inactions were harmful to the corporation or a breach of their fiduciary duties") (emphasis added).

[150] *Citigroup*, 964 A.2d 106 at 133 n.91, 134.

36

would require USAA members to answer a multitude of additional questions about their personal finances, and to review information related to [the] total cost of new car ownership, before being able to access the TrueCar car buying site."[151] This initiative reflected USAA's shift to a more "advice-centric organization" that would focus on its members' financial health and de-emphasize new car purchases.[152]

According to Plaintiffs, six of the Demand Board directors learned about the USAA website redesign at the Board's February 9, 2017 meeting and were obligated to cause the Company to correct the Challenged Statements thereafter because the redesign was expected to have a material adverse impact on TrueCar's financial performance, but they failed to do so. Plaintiffs further contend that these six directors subsequently "continued to conceal the truth and affirmatively mislead investors."[153]

As discussed below, the court finds that Plaintiffs have failed to plead with particularity facts demonstrating that any of the directors on the Demand Board knew about the USAA website redesign before they were briefed on the issue at a Board meeting in September 2017, and thus Plaintiffs have failed to sufficiently

---

[151] Compl. ¶ 92.

[152] *Id.* ¶ 89.

[153] Pls.' Answering Br. at 36.

plead facts demonstrating *scienter* concerning the alleged inaccuracy of the Challenged Statements up to that time. To examine the state of the directors' knowledge, the court considers Plaintiffs' allegations chronologically for three time periods: (i) up to the Secondary Offering, which closed by early May 2017; (ii) after the close of the Secondary Offering and before the September 2017 meeting where the Board was briefed on the USAA website redesign; and (ii) from the September 2017 Board meeting until November 6, 2017, when TrueCar released its results for its third quarter ending September 30, 2017 and publicly disclosed the USAA website redesign and the impact it had on TrueCar's business in the third quarter.

### a.  The Demand Directors' Knowledge up to the Secondary Offering

As discussed above, USAA directs customers to TrueCar through a website it co-branded with TrueCar and that TrueCar "hosted, managed and operated."[154] "In or around January 2017," USAA decided to redesign the website "to deemphasize car purchasing."[155] According to the Complaint, although the changes to the website did not become effective until June 1, 2017, USAA informed TrueCar about the website redesign by "early 2017."[156] It is logical that members of TrueCar's

---

[154] Compl. ¶ 82.

[155] *Id.* ¶ 91.

[156] *Id.* ¶¶ 91-92.

*management* would have become aware of the website redesign at some point in advance of its implementation—although it is not clear precisely what they knew about the redesign and when they knew it—given that "any changes USAA made to the car buying site required TrueCar's implementation."[157]  Indeed, during the November 6, 2017 earnings call, TrueCar's CEO at the time acknowledged that the Company saw the "changes coming."[158]  The critical question before the court, however, is not when TrueCar's management learned about the website redesign, but *when the members of the Demand Board* were informed about the redesign and understood its significance to TrueCar's financial performance.

Plaintiffs contend that six of the eight members of the Demand Board (Buce, Krafcik, Yadigaroglu, Claus, Lantz, and Nichols) learned about the USAA website redesign during a regularly scheduled Board meeting held on February 9, 2017.  For support, Plaintiffs point to two statements and a chart in the Board materials for the meeting.  The first statement is that one of the Company's goals for 2017 was to "re-energize" its relationship with USAA.[159]  The second statement appears on a page identifying nine risks for the Company in 2017, one of which was "USAA

---

[157] *Id.* ¶ 82.

[158] *Id.* ¶ 149.

[159] Compl. ¶ 94; *see also* February 2017 Board Presentation at 40.

underperformance."[160]  The chart, as described by Plaintiffs, showed that "USAA's year-over-year unit growth had peaked at 16% in the fourth quarter of 2016, and was expected to fall sequentially to 15%, 12%, 11%, and 10% over the next four quarters."[161]  In my opinion, these references are insufficient to demonstrate with particularity that the directors present at the February 2017 Board meeting were told about the USAA website redesign at that meeting, much less that they knew the redesign would negatively impact TrueCar's financial performance in a materially adverse manner.

To start, the Board materials *never mention the co-branded website or that USAA planned to redesign its website*.  Nor is there any such reference in the minutes of the meeting.[162]  Second, the chart Plaintiffs rely on does not show that the Company's sales attributable to USAA were expected to suffer later in 2017, when the website redesign was to be implemented.  To the contrary, the chart shows that TrueCar's overall outlook, and its outlook for sales generated by USAA in particular, was positive for 2017.

---

[160] Compl. ¶ 94; *see also* February 2017 Board Presentation at 67.  The other nine factors covered a range of items, including a litigation risk, "monetization," "data costs," and "macroeconomics."  February 2017 Board Presentation at 67.

[161] Compl. ¶ 95.

[162] *See* German Aff. Ex. 13 (February 9, 2017 Board meeting minutes).

40

With respect to USAA specifically, the chart projected (i) increasing unit sales for 2017, growing from 64.2 million in the first quarter to 75.5 million by the fourth quarter of 2017; (ii) overall growth of approximately 12% from fiscal year 2016 to fiscal year 2017, *i.e.*, from approximately 255 units in 2016 to 285 units in 2017; (iii) year-over-year quarterly growth for all the quarters in 2017; (iv) and growth for the second half of 2017, after the website changes were to be implemented.[163] This forecast is flatly inconsistent with the suggestion that the Board was informed at its February 2017 meeting that USAA's plan to change its website would negatively impact TrueCar's financial performance. Plaintiffs' counsel acknowledged as much at oral argument, conceding it was a "reasonable inference" that "the upcoming change to the USAA website, . . . , was *not* taken into account in the forecast."[164]

At bottom, Plaintiffs' contention that six of the Demand Board directors knew in February 2017 that the Challenged Statements were false depends on two references in the Board materials about risk of "USAA underperformance" and the desire to "re-energize" the Company's relationship with USAA.[165] Given the

---

[163] *See* February 2017 Board Presentation at 58.

[164] Tr. at 54 (emphasis added).

[165] It is no surprise that "USAA underperformance" would be listed as one of the Company's nine risks for 2017 given, as Plaintiffs allege, USAA accounted for 32% of the units TrueCar sold and 45% of its total contribution profit for 2016. Compl. ¶ 94. To that end, TrueCar's Board presentations in 2017 regularly separated out the data for USAA from TrueCar's other affinity partners. *See* February 2017 Board Presentation; German

41

vagueness of these phrases, which are susceptible to multiple interpretations; the absence of any direct reference to the USAA website or its redesign in the Board package or the minutes of the meeting; and that the forecast in the Board package provided no indication that TrueCar expected its sales from USAA to be adversely impacted in 2017 and, to the contrary, projected that those sales would increase; Plaintiffs have failed to allege with particularity facts sufficient to support a reasonable inference of *scienter*, *i.e.*, that the directors in attendance at the meeting knew before they signed or approved the Company's 2016 Form 10-K that TrueCar's business, and specifically its USAA channel, would suffer in the second half of 2017.[166]

On April 17, 2017, the Board held a special meeting during which it authorized the Secondary Offering.[167] The Complaint alleges that the same six directors on the Demand Board signed off on the same risk disclosures in the Secondary Offering Documents.[168] The Complaint does not allege, however, any

Aff. Exs. 5 (May 2017 Board Presentation), 6 (July 2017 Board Presentation), 8 (September 2017 Board Presentation).

[166] According to the Complaint, six members of the Demand Board (Buce, Krafcik, Yadigaroglu, Claus, Lantz, and Nichols) signed the 2016 Form 10-K and three of them (Buce, Claus, and Lantz) served on the Audit Committee that "reviewed and approved" the Form 10-K for filing with the SEC. Compl. ¶¶ 103-04.

[167] *Id.* ¶ 108.

[168] *Id.* ¶¶ 114, 116.

facts indicating that the Board learned any information about the website redesign between the February Board meeting and when the Secondary Offering Documents were completed on April 26, 2017. Without more, there is no basis to infer that any of the Demand Board directors knew that the Challenged Statements were inaccurate when the final documents for the Secondary Offering were approved.

Plaintiffs' allegations regarding TrueCar stock sales also do not support an inference of *scienter* on behalf of any of the Demand Board directors. To begin, none of the Demand Board directors are alleged to have sold shares of TrueCar personally before or in connection with the Secondary Offering.[169] Plaintiffs contend that entities affiliated with Claus (USAA), Nichols (Upfront), and Yadigaroglu (Capricorn) sold a substantial number of shares in the Secondary Offering.[170] As discussed in Part III.B above, however, the shares sold by USAA and Upfront cannot be attributed to Claus and Nichols. Although Capricorn's sales may be attributed to Yadigaroglu at this stage of the case, the circumstances of Capricorn's stock sales, by themselves, do not support a reasonable inference of *scienter* with respect to Yadigaroglu for the reasons discussed in Part III.E below.

---

[169] *See* Compl. ¶ 176.

[170] *Id.* ¶¶ 33, 113, 176.

Finally, Plaintiffs contend the court may infer *scienter* because "Directors are presumed to have knowledge of the corporation's core operations that drive the Company's bottom line, as is the case here with respect to the significant website changes implemented by TrueCar's single-greatest contributor to its revenues and profits."[171] Plaintiffs again cite *Fitbit* for support, but this case does not aid them.[172]

In *Fitbit*, Vice Chancellor Slights specifically stated that the core operations "doctrine is *not sufficient on its own* in the context of generally pled allegations to establish scienter."[173] In addition to pleading "that the products featuring the . . . technology [at issue] accounted for 80% of Fitbit's revenue," the Plaintiffs in *Fitbit* also plead:

> that Fitbit experienced serious problems with the technology early on, that Fitbit attempted to design fixes to the problems and those fixes were not working, that management *was keeping the Board apprised of the problems and the efforts to address them*, and that, all the while, Fitbit was touting the promise and success of [the technology] to the market.[174]

The *Fitbit* court thus concluded that "[t]he totality of the facts Plaintiffs have pled with particularity allow a reasonable pleading stage inference that, because the

---

[171] Pls.' Answering Br. at 32 (internal quotation marks and emphasis omitted).

[172] 2018 WL 6587159, at *15 & n.179 (Del. Ch. Dec. 14, 2018).

[173] *Id.* (emphasis added).

[174] *Id.* at *15 (emphasis added).

problems with [the technology] were profound and . . . drove the Company's bottom line, . . . the Board knew of the alleged material, nonpublic information."[175]

Here, unlike in *Fitbit*, Plaintiffs do not allege particularized facts to allow a reasonable inference that TrueCar management provided reports to or otherwise informed the Board about any expected changes to the USAA website at any time before the Secondary Offering closed.[176] Given the absence of such allegations, the core operations doctrine "on its own" does not allow the court to infer *scienter* based on the general allegation that USAA was the single-greatest contributor to TrueCar's revenues and profits.[177]

---

[175] *Id.*

[176] *See id.* at *5, *7, *12 (alleging that directors received reports detailing the company's inability to remedy problems, that there were internal management reports detailing the inability to fix the problems, and that management sought to conceal this information by instructing employees to destroy sensitive presentation slides).

[177] 2018 WL 6587159, at *15 & n.179.

### b. The Demand Directors' Knowledge Between the Secondary Offering and the September Board Meeting

This section considers Plaintiffs' allegations of *scienter* for the period after the close of the Secondary Offering in early May 2017 and before the September 15, 2017 Board meeting.

On May 3, 2017, Demand Board directors Buce, Claus, and Lantz participated in a meeting of the Audit Committee that "discussed changes to the Company's risk factors in its SEC filings. . . . [and] approved filing the Form 10-Q without updating the risk disclosure regarding USAA, despite the fact that . . . the roll-out of the redesigned USAA co-branded car buying website . . . was mere weeks away."[178] The Complaint does not allege any particularized facts concerning this meeting that would allow the court to infer that these individuals had learned of any information concerning USAA's website redesign. Absent such allegations, the court cannot reasonably infer that Buce, Claus, and Lantz had the requisite *scienter* to face a substantial likelihood of liability for failing to change the risk disclosures in the Company's Form 10-Q for the first quarter of 2017, which was issued in May.

The Complaint next alleges that, after TrueCar implemented the website changes on June 1, 2017, "[t]he Individual Defendants were immediately aware of

---

[178] Compl. ¶ 117 (emphasis omitted).

USAA's sales declines because they had real-time access to the Company's transactions."[179]  This allegation, however, is unsupported by any particularized facts concerning the knowledge of any of the Demand Board directors.  Accepting as true that members of TrueCar management overseeing the USAA relationship had real-time access to sales transactions generated by USAA, and that they "were immediately aware" of declines or, as Guthrie, TrueCar's CFO at the time, told investors during an earnings call, at least "started to see [the shortfall] in August and September[,]" the Complaint pleads no facts suggesting that this subject was brought to the attention of the Board at any time until its September 15 meeting.[180]

At its July 27, 2017 meeting, the Board discussed "a minor change that USAA had previously implemented to its website" that was unrelated to the website redesign implemented in June 2017.[181]  Notably, the Complaint cites this event as

[179] *Id.* ¶ 124 (alleging that, at an investor conference in May 2017, Guthrie discussed the Company's access to "dealer management software," which "showed all car sales at the dealership in real time, including for the Company's affinity partner sites such as USAA's: 'What that allows us to do is see every transaction that flows through the dealership. We know every transaction that comes through either our branded business or through our affinity business.'") (emphasis omitted).

[180] *Id.* ¶ 151; German Aff. Ex. 10 (November 6, 2017 earnings call transcript), at 12.

[181] Compl. ¶ 130 ("A slide in the presentation materials distributed to the Board noted an '11% decrease in total new car search visitors' from the first quarter of 2016 to the second quarter of 2017, and explained that 'USAA loss of new car traffic [was] due to removal of site link.'"); *see also* German Aff. Ex. 6, at 6.

evidence that the Board was "closely monitoring USAA's co-branded website."[182] Yet, the only other allegations concerning the July Board meeting relevant to USAA are vague references in the Board materials for the CEO's update that the relationship with USAA was "fragile" and "needs more attention."[183]

The only other facts alleged for the period from early May until the Board's September meeting involving the Demand Board directors relate to an Audit Committee meeting held on August 3, 2017, which Buce, Claus, and Lantz attended, and several stock sales by Buce, Krafcik, and Yadigaroglu in August.[184] Here too the Complaint does not allege that the Audit Committee discussed the USAA website redesign or any expected negative results from its implementation to support a reasonable inference of *scienter* when the Company's second quarter Form 10-Q was approved for filing at that meeting.[185]

Finally, the Complaint alleges that Buce, Krafcik and Yadigaroglu (through Capricorn) sold shares in the latter part of August.[186] As discussed below in

---

[182] Compl. ¶ 130.

[183] *Id.* ¶ 129.

[184] *Id.* ¶¶ 132, 176.

[185] *Id.* ¶ 132.

[186] *Id.* ¶ 176.

Part III.E, the circumstances of these sales, by themselves, do not raise suspicion to warrant an inference of *scienter*.

### c. The September Board Meeting and Later Events

This section considers Plaintiff's allegations for the period from September 15, 2017, when the Board was informed about the USAA website redesign, to the Company's earnings release on November 6, 2017.

According to the Complaint, the Board held a special meeting on September 15, 2017 where a presentation was made concerning USAA's website redesign. Specifically, the presentation included a slide titled "Old vs. New USAA Consumer Experience" that illustrated the redesign with screenshots comparing USAA's "Old Experience Landing Page," which was devoted almost entirely to searching and shopping for cars, to its "New Experience Landing Page," which shows only one box titled "Find My Next Car" among several other boxes concerning financing, insurance, and budgeting.[187] The presentation also explained that "preliminary August results indicate below guidance performance," that "USAA [unit] performance significantly affected . . . Q3 2017," and that TrueCar was projecting

---

[187] *Id.* ¶ 139; German Aff. Ex. 8, at 12.

approximately 12,000 lost USAA sales for the third quarter, equating to approximately $1.8 million in lost USAA revenue for the quarter.[188]

The Complaint next discusses the Board's regular meeting on October 26, 2017, where the Company's Chief Product Officer gave a presentation regarding the new user experience on the USAA site.[189] The presentation showed that the "USAA [channel] struggled in Q3" and "USAA's new experience introduces more barriers to entry into the car buying service," which "significantly impacted USAA's [unit] performance."[190] A few days later, during a regular meeting of the Disclosure Committee held on October 30, the Company's Deputy General Counsel "discussed updates to the Risk Factors included in the Form 10-Q" and the "Committee discussed certain disclosures related to the Company's relationship with USAA and the effect of recent changes to the user experience on USAA's car buying service on the Company."[191]

On November 6, 2017, TrueCar released its results for the third quarter ended September 30, 2017 and reported a net loss of $9.5 million.[192] During an earnings

---

[188] German Aff. Ex. 8, at 4, 11; Compl. ¶ 138.

[189] Compl. ¶ 141; German Aff. Ex. 9 (October 2017 Board Presentation), at 71.

[190] Compl. ¶ 141; German Aff. Ex. 9, at 70-71.

[191] Compl. ¶ 142.

[192] *Id.* ¶ 143.

call held that day, management discussed the changes to USAA's website and its impact on TrueCar's business, including a 5% decline in units generated by USAA in the third quarter.[193] Guthrie, TrueCar's CFO at the time, explained during the call that USAA's performance was "pretty good" in July and that the Company "started to see" the shortfall caused by the USAA website redesign in August.[194]

The Complaint does not allege that any of the Demand Board directors sold sales shares of TrueCar from September 15, 2017 to the earnings release on November 6, 2017, either personally or, in the case of Yadigaroglu, through Capricorn.[195]

\* \* \* \* \*

To summarize the above discussion, the Complaint fails to allege with particularity facts to support a reasonable inference that any of the members of the Demand Board knew about the USAA website redesign that was implemented in June 2017 or its potential impact on TrueCar's financial performance until they were briefed on the issue at the September 15, 2017 Board meeting. Given Plaintiffs' failure to sufficiently allege *scienter*, Plaintiffs have failed to show that any of the

---

[193] *Id.* ¶ 144.

[194] *Id.* ¶ 151.

[195] *Id.* ¶ 176.

Demand Board directors acted in bad faith so as to face a substantial likelihood of liability for failing to correct the three Challenged Statements during this period.

The Board's actions after learning about the USAA website redesign at the September 15 Board meeting are discussed in the next section in response to Plaintiffs' contention that directors on the Demand Board ignored red flags and thus face a substantial likelihood liability under a *Caremark* theory.

### 2. The *Caremark* Claim

Plaintiffs argue that even if "the Demand Board did not have actual knowledge of the USAA/TrueCar Website changes and their inevitable negative effects, they still face a substantial risk of liability under a classic *Caremark* theory for failing to apprise themselves of such information."[196]

To plead a substantial likelihood of liability under *Caremark*, a stockholder must allege particularized facts to show that either (i) "the directors utterly failed to implement any reporting or information system or controls" or that (ii) "having implemented such a system or controls, [the directors] consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention."[197]  Plaintiffs make no effort to plead a *Caremark*

---

[196] Pls.' Answering Br. at 46.

[197] *Reiter v. Fairbank*, 2016 WL 6081823, at *7 (Del. Ch. Oct. 18, 2016).

claim under the first theory, nor could they do so. The Complaint acknowledges that TrueCar had systems in place to review and approve its public filings, including an Audit Committee and a Disclosure Committee charged with handling the Company's public filings with the SEC.[198]

Plaintiffs instead argue that, "assuming TrueCar had a Board-level monitoring system in place, the Demand Board failed to utilize that system in the face of significant red flags," for which they point to the following:

> the prior USAA website change to the location and prominence of links to TrueCar's platform that led to a substantial loss of traffic from USAA, and numerous Board presentations identifying the USAA relationship as 'fragile,' that 'USAA underperformance' was a top risk, and projecting a declining USAA growth rate for all of 2017.[199]

These allegations are woefully insufficient to support a reasonable inference that the "directors were conscious of the fact that they were not doing their jobs, and that they ignored red flags indicating misconduct."[200]

As discussed above, the vague references to a "fragile" relationship and "USAA underperformance" in Board presentations fail to demonstrate with

---

[198] *See* Compl. ¶¶ 58 (Audit Committee responsible for, among other things, reviewing the Company's annual and quarterly reports on Form 10-K and 10-Q), 60 (Disclosure Committee responsible for, among other things, adopting and implementing procedures and policies concerning the preparation of SEC reports).

[199] Pls.' Answering Br. at 46-47 (citing Compl. ¶¶ 94-95, 129) (emphasis omitted).

[200] *In re LendingClub*, 2019 WL 5678578, at *11 (citation omitted).

particularity that the directors were made aware of USAA's website redesign, much less that they knew that the redesign would have a material adverse impact on TrueCar's financial performance.[201] Indeed, the forecast provided to the Board in February 2017 presented a positive outlook for sales generated by USAA.[202] Additionally, the fact that the Board was made aware in July 2017 of a "prior USAA website change" and told in September 2017 about the website redesign that USAA implemented in June 2017, demonstrates that the Company's monitoring systems kept the Board apprised of important developments concerning its relationship with USAA.[203]

Finally, the Complaint's allegations belie Plaintiffs' suggestion that the Board failed to do anything to correct the Challenged Statements after learning about the website redesign. To the contrary, the allegations of the Complaint depict a reasonable progression of events over the course of about seven weeks: (i) calling a special meeting on September 15 to brief the Board about the website redesign after preliminary results for August raised a concern that the USAA channel was performing below guidance,[204] (ii) discussing the Company's third quarter results at

---

[201] *See supra* Parts III.D.1.a-b.

[202] *See supra* Part III.D.1.a.

[203] *See supra* Parts III.D.1.b-c.

[204] Compl. ¶¶ 137-39.

54

a regular Board meeting on October 26,[205] and (iii) then releasing the Company's results ten days later with an explanation concerning USAA's website redesign and its impact on TrueCar.[206]

In short, this is not a case where the Board "had notice of serious misconduct and simply failed to investigate."[207] Based on the allegations in the Complaint, none of the members of the Demand Board face a substantial likelihood of liability for a *Caremark* claim.

### 3. The Securities Class Action

Plaintiffs assert for their final demand futility argument as to the Disclosure Claim that "not a single member of the Demand Board could have considered a demand impartially because doing so would have undercut or even compromised the defense of the then-pending Securities Class Action."[208] In making this argument, Plaintiffs quote part of a sentence from a two-paragraph order the district court in the Securities Class Action entered in denying defendants' motion to dismiss, as follows: "[T]he court had found that the plaintiff adequately alleged 'a strong inference of scienter by alleging that Defendants knew about USAA's website

---

[205] *Id.* ¶¶ 141; German Aff. Ex. 8.

[206] Compl. ¶¶ 143-49, 151-53.

[207] *South v. Baker*, 62 A.3d 1, 15 (Del. Ch. 2012).

[208] Pls.' Answering Br. at 55-58.

redesign and its impact as of January 2017.'"[209]  The district court's entire analysis, including the quoted statement, is provided below:

> The Court has reviewed Plaintiff's Amended Class Action Complaint and Defendants' motion to dismiss.  For purposes of the motion-to-dismiss stage, Plaintiff has adequately alleged—under both the plausibility and heightened pleading standards—that Defendants made materially false and misleading statements by making risk statements regarding TrueCar's reliance on USAA's website without alerting the public that the risk had already come to fruition and by falsely representing that USAA would be a key driver of unit and revenue growth in 2017.  Furthermore, Plaintiff has adequately alleged a strong inference of scienter by alleging that Defendants knew about USAA's website redesign and its impact as of January 2017 and that Guthrie and Pierantoni sold TrueCar stock in sales that were suspicious in their timing, size, and amount, especially in light of Guthrie's and Pierantoni's prior sales.  Assuming, as it must, the allegations to be true, the Court DENIES Defendants' motion to dismiss.[210]

Plaintiffs' argument fails for two reasons in my view.

First, as plead in the Complaint, although the Securities Class Action asserted *scienter*-based claims against certain TrueCar officers, including Perry, Guthrie, and Pierantoni,[211] it only asserted "strict liability and negligence claims" against the non-

---

[209] Pls.' Answering Br. at 56.

[210] *Milbeck*, 2019 WL 476004, at *1 (citations omitted).

[211] Compl. ¶¶ 26-28 (alleging that claims under Section 10(b) of the Exchange Act, Rule 10b-5 promulgated thereunder, and Section 20(a) of the Exchange Act were asserted against Guthrie (CFO), Perry (President and CEO), and Pierantoni (CAO)).

officer directors of TrueCar, which include six members of the Demand Board.[212]

Given TrueCar's exculpatory charter provision and the absence of *scienter*-based

claims against the Demand Board directors named in the Securities Class Action,

those directors would not face a substantial likelihood of personal liability in that

action so as to compromise their ability to impartially consider a demand with

respect to the Disclosure Claim here.

Vice Chancellor McCormick reached a similar conclusion in *In re*

*LendingClub Corp. Derivative Litigation*.[213]   There, plaintiffs contended that a

related federal securities action asserting strict liability and negligence claims

against members of a demand board compromised those directors' ability to

impartially consider a demand concerning the subject matter in that action.[214]   The

*LendingClub* court cogently explained that:

---

[212] *Id.* ¶¶ 29-33, 37-39 (alleging "strict liability and negligence claims . . . under Sections 11, 12(a)(2), and 15 of the Securities Act" against current and former TrueCar directors).

[213] 2019 WL 5678578 (Del. Ch. Oct. 31, 2019).

[214] *Id.* at *15-16.

To hold the Director Defendants liable in this action, Plaintiffs must prove that the directors acted in bad faith—that is, there must be some factual support speaking to the Director Defendants' state of mind at the time the challenged conduct occurred. By contrast, the Section 11 claims sustained against the Director Defendants in the Securities Class Action did not require a showing of scienter. The only claims that required a showing of scienter in the Securities Class Action were the Section 10(b) and Rule 10b-5 claims asserted exclusively against [non-Demand Board members]. Liability under Section 11 would not, in and of itself, have gotten to the heart of whether the directors acted in bad faith concerning wrongdoing at issue in both actions. There is thus no basis for this Court to conclude that the Demand Board members would have viewed the Securities Class Action as posing a substantial likelihood of liability concerning the *Caremark* claims in this case.[215]

Although the companion federal securities action in *LendingClub* did not survive a motion to dismiss until after the complaint was filed in the Court of Chancery, Vice Chancellor McCormick went on to explain that "the federal court's [eventual] decision to sustain the Section 11 claims in the Securities Class Action does not alter the analysis, because the Section 11 claims do not speak to the main ground in this case—the Director Defendants' good faith."[216]

Second, the parties in the Securities Class Action executed a Settlement Agreement that was filed with the district court on August 2, 2019, *before* the first complaint in this action was filed on August 22, 2019.[217]    As is typical, the

---

[215] *Id.*

[216] *Id.* at *16.

[217] *See* Dkt. 5.

Settlement Agreement denies all wrongdoing and releases all claims in the case.[218] Although the district court did not finally approve the settlement until January 27, 2020,[219] after this action commenced, execution of the Settlement Agreement eliminated as a practical matter any reason to doubt that the Securities Class Action would compromise the ability of the Demand Board directors to impartially consider a demand with respect to the Disclosure Claim out of concern that those directors were exposed to personal liability in the Securities Class Action.

Once again citing *Fitbit*, Plaintiffs argue that "the Defendants could not consider a demand to prosecute this action without compromising their *factual* defenses in the Securities Class Action" because they "are premised on the same underlying *factual* conduct."[220] After determining that the plaintiffs had alleged sufficient "well-pled facts . . . [to] adequately support a reasonable inference that the Selling Defendants sought to make trades based on nonpublic information," the *Fitbit* court considered the findings in a companion federal case.[221] In particular, the

---

[218] *See* Settlement Agreement, at 8 (Part III "Defendants' Denial of Wrongdoing and Liability"), 29 (§ 5 "Release of Claims"). The court may take judicial notice of these terms because they are not subject to reasonable dispute between the parties. *In re Rural Metro Corp. S'holder Litig.*, 2013 WL 6634009, at *9 (Del. Ch. Dec. 17, 2013) (taking judicial notice of a federal court filing).

[219] Final Approval Order.

[220] Pls.' Answering Br. at 58.

[221] 2018 WL 6587159, at *15-16.

Court of Chancery noted that the district court had found "that a holistic review of the allegations suffices to establish scienter[,]" which bolstered the Court of Chancery's conclusion that knowledge had been sufficiently pled against four of seven Fitbit demand board members.[222] The Court of Chancery thus reasoned that a majority of the demand board was incapable of considering a demand impartially because those directors faced a substantial likelihood of liability in the companion federal case.[223]

Here, it is unclear from the paragraph quoted above containing the district court's analysis in the Securities Class Action whether its comments concerning *scienter* were intended to apply to all defendants in that action or—as would be logical—only to those who were the subject of *scienter*-based claims, such as Guthrie and Pierantoni, two officers whom the district court found had engaged in suspicious stock sales. The term "Defendants" is not defined in the district court's order, nor does the district court discuss the allegations on which it relied or the rationale for its conclusions, other than relating to Guthrie and Pierantoni.

---

[222] *Id.* at *16-17.

[223] *Id.* at *11, *16.

As for Plaintiffs' argument, it also is unclear what "factual defenses" a director would fear having compromised in a case that only asserts claims for strict liability and negligence against him, for which the director would be exculpated from personal liability.[224] In any event, here, unlike in *Fitbit*, (i) the allegations in the Complaint do not support a reasonable inference of *scienter*, *i.e.*, that the directors on the Demand Board knew of the website redesign or its impact at the time of the alleged misconduct and (ii) even if they did, there was an executed Settlement Agreement in place before this action was filed that, for all intents and purposes, eliminated any reason to doubt the ability of the Demand Board directors to impartially consider a demand with respect to the Disclosure Claim.[225]

---

[224] The issue of personal liability is typically the core inquiry for assessing a director's impartiality with respect to companion actions concerning the same or similar alleged misconduct. *See, e.g.*, *In re GoPro, Inc.*, 2020 WL 2036602, at *15 & n.181 (Del. Ch. Apr. 28, 2020) (demand not excused because plaintiffs failed to plead that "a majority of the Demand Board faces a substantial likelihood of personal liability, either with respect to the related securities litigation or the *Brophy* claim pending here" and "only a substantial likelihood of liability would make it 'improbable that the director could not perform her fiduciary duties to the shareholders'"); *Rojas on behalf of J.C. Penney Co., Inc. v. Ellison*, 2019 WL 3408812, at *14 (Del. Ch. July 29, 2019) (demand not excused because plaintiffs failed to allege that a majority of the demand board faced a substantial likelihood of liability for consciously failing to monitor and none had "any personal exposure in [the related federal securities] action"); *Pfeiffer v. Toll*, 989 A.2d 683 (Del. Ch. 2010) (demand was futile because a majority of the demand board faced a substantial likelihood of liability for claims in a pending parallel securities class action), *abrogated on other grounds by Kahn v. Kolberg Kravis Roberts & Co. L.P.*, 23 A.3d 831 (Del. 2011).

[225] *Fitbit*, 2018 WL 6587159, at *9, *17 (companion federal case settled nearly a year after the Court of Chancery action was initiated).

For the reasons explained above, Plaintiffs have failed to plead with particularity facts sufficient to impugn the impartiality of any of the members of the Demand Board to consider a demand with respect to the Disclosure Claim based on the pendency of the Securities Class Action when this action was filed.

\* \* \* \* \*

More broadly, for all the reasons explained in Parts III.D.1-3, Plaintiffs have failed to plead with particularity facts sufficient to impugn the impartiality of any of the members of the Demand Board to consider a demand with respect to the Disclosure Claim based on any of the theories they have advanced, *i.e.*, (i) for failing to correct the Challenged Statements, (ii) based on a *Caremark* theory, or (iii) based on the pendency of the Securities Class Action.

### E.    Whether Demand is Excused as to the *Brophy* and Unjust Enrichment Claims

Plaintiffs appear to assert essentially four arguments why a majority of the Demand Board could not impartially consider the *Brophy* and unjust enrichment claims, which will be referred to hereafter, together, as the *Brophy* claim.[226]  The first three grounds overlap with arguments the court already has addressed and the

---

[226] The parties analyzed the *Brophy* and unjust enrichment claims together, as will the court. This is sensible because "the public policy underlying a *Brophy* claim is to prevent unjust enrichment based on the misuse of confidential corporate information." *In re Fitbit, Inc. S'holder Deriv. Litig.*, 2019 WL 190933, at \*4 n.26 (Del. Ch. Jan. 14, 2019).

fourth ground concerns the Demand Board directors who are targets of the *Brophy* claim. The court addresses each of these arguments in turn.

First, Plaintiffs assert that seven of the eight members of the Demand Board (all but non-party McKoy) are conflicted "because the *Brophy* claim is premised on the same facts (and knowledge/scienter) as the false and misleading statements claim for which *all* of the Demand Defendants face a substantial likelihood of liability."[227] As explained in Parts III.D.1-2, none of the Demand Board directors face a substantial likelihood of liability with respect to the Disclosure Claim and thus there is no reason to doubt their impartiality to consider a demand as to that claim.

Second, Plaintiffs contend that a majority of the Demand Board is conflicted due to the Securities Class Action. As discussed in Part III.D.3, none of the six Demand Board directors named in that case face a substantial likelihood of liability in the Securities Class Action because they would be exculpated for all the claims asserted against them (for strict liability and negligence) and because an executed Settlement Agreement was in place in that action before this case was filed. Thus,

---

[227] Pls.' Answering Br. at 51.

63

there is no reason to doubt their impartiality to consider a demand at to the *Brophy* claim, which requires proof of *scienter*.

Third, Plaintiffs assert that Claus is "conflicted with respect to this claim due to his significant affiliation with USAA."[228] There are two basic problems with this contention. The first is that Claus' independence is an academic question because the *Brophy* claim fails to state a claim for relief against USAA because USAA does not owe a fiduciary duty to TrueCar or its stockholders for the reasons explained in Part III.A. The second problem is that Plaintiffs have failed to plead facts sufficient to create a reasonable doubt about Claus's independence from USAA.

The Complaint alleges that Claus was last employed by USAA in March 2014, serves on the board of a USAA affiliate (USAA Real Estate Company), and serves on the TrueCar Board as USAA's "representative."[229] Apart from the fact that Claus's employment with USAA ended about three and a half years before this action was filed, the Complaint fails to allege any additional facts about his former employment with USAA—such as any significant relationships with USAA's current leadership—to overcome the presumption of independence directors are

---

[228] Pls.' Answering Br. at 51.

[229] Compl. ¶¶ 37, 80.

64

accorded under Delaware law.[230] Nor does the Complaint allege that Claus received material compensation for his service on USAA Real Estate's board or that USAA has the unilateral power to remove Claus from that board or the TrueCar Board, such that his "discretion would be sterilized."[231] Without more, it is not reasonable to doubt Claus's independence from USAA for purposes of considering a demand.

Fourth, and finally, Plaintiffs contend that—at most[232]—Buce, Claus, Krafcik, Nichols, and Yadigaroglu could not impartially consider a demand with respect to the *Brophy* claim because each is a target of the claim and faces a substantial likelihood of liability for breaching his fiduciary duty of loyalty for insider trading.[233] For the reasons explained in Part III.B, the Complaint fails to state a *Brophy* claim against Claus or Nichols because neither is alleged to have sold

---

[230] *Odyssey P'rs, L.P. v. Fleming Cos.*, 735 A.2d 386, 408 (Del. Ch. 1999) (past employment with an interested party is not enough to rebut independence); *Baiera*, 119 A.3d at 60.

[231] *See Rales*, 634 A.2d at 934-36; *MCG Capital Corp. v. Maginn*, 2010 WL 1782271, at *20 (Del. Ch. May 5, 2010) (plaintiff failed to allege that $100,000 in director compensation was material to two directors, and thus failed to allege that their "judgment would be impaired by the threat of losing" that compensation).

[232] It is unclear whether Plaintiffs intended to assert a *Brophy* claim against Claus and Nichols as neither is included in the definition of "Individual Selling Defendants" as to which the *Brophy* claim is asserted. *See* Compl. ¶¶ 45, 209, 215. Also, Plaintiffs' brief does not identify Claus as a target of the *Brophy* claim. *See* Pls.' Answering Br. at 47-53.

[233] Pls.' Answering Br. at 49.

TrueCar shares personally and because the stock sales of USAA and Upfront are not attributable to Claus and Nichols, respectively.

Given the points addressed above, Plaintiffs have failed to impugn the impartiality of a majority of the eight-person Demand Board, *i.e.*, Claus, Lantz, Mendel, Nichols, and non-party McKoy. For the sake of completeness, the court will address Plaintiffs' arguments concerning the *Brophy* claim with respect to the remaining three directors—Buce, Krafcik, and Yadigaroglu.

To repeat, to state a claim under *Brophy*, a plaintiff must allege that, "1) the corporate fiduciary possessed material, nonpublic company information; and 2) the corporate fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance of that information."[234] As to the first element, this court explained some of the circumstances to consider when determining whether a reasonable inference of *scienter* has been made concerning an insider's trade of stock, as follows:

> At the pleading stage, by necessity, a *Brophy* claim usually rests on circumstantial facts and a successful claim typically includes allegations of unusually large, suspiciously timed trades that allow a reasonable inference of scienter. While the fact a fiduciary sells stock near the time he learns of material, nonpublic information might be evidence of the seller's motive, temporal proximity alone generally is insufficient to support an inference of scienter that will survive a motion to dismiss. The other important piece of circumstantial evidence that,

---

[234] *In re Oracle*, 867 A.2d at 934.

66

along with timing, might support an inference of scienter is the size of the trade relative to the defendant's overall stock holdings. If a defendant sells only a small portion of her holdings and retains a "huge stake in the company," then it is difficult reasonably to infer she was "fleeing disaster or seeking to make an unfair buck."[235]

The Complaint alleges that Buce sold 32,999 shares on August 18, 2017, yielding proceeds of approximately $545,000; and that Krafcik sold a total of 20,000 shares on August 15 and 31, 2017, yielding proceeds of $334,500.[236] These sales do not raise suspicion to warrant an inference of *scienter* given that the amount of shares traded were small relative to each of their overall holdings—only about 3% for Krafcik and 7% for Buce—and given that the trades were made *several weeks after* the Lock-Up for the Secondary Offering had expired, on July 25, 2017.[237] Nor do Plaintiffs allege that these sales were inconsistent with Buce and Krafcik's past trading practices.[238]

---

[235] *In re Clovis Oncology, Inc. Derivative Litigation*, 2019 WL 4850188, at *15 (Del. Ch. Oct. 1, 2019) (quoting *Oracle*, 867 A.2d at 954) (alterations omitted).

[236] Compl. ¶ 176.

[237] *Id.* ¶¶ 115, 127, 176. German Aff. Exs. 14-15, 17 at 18 (Buce sold 7% of his holdings and Krafcik sold 3% of his holdings). *See Oracle*, 867 A.2d at 954 (sales of 7% and 2% of holdings, despite generating nearly a billion dollars, did not indicate *scienter*).

[238] *Clovis*, 2019 WL 4850188, at *16 ("Noticeably absent from the Complaint are any well-pled facts that the trades at issue represented a deviation from the sellers' past trading practices.").

Plaintiffs make a perfunctory argument that the larger sales of *other* insiders raise suspicion about Buce and Krafcik's sales.[239] This argument fails. As this court explained in *Guttman v. Huang*, a plaintiff must allege *scienter* for "each sale by each individual defendant."[240] Plaintiffs fail to plead facts sufficient to support a reasonable inference of *scienter* as to Buce and Krafcik not only because the circumstances of their stock sales are not inherently suspicious, but because, after obtaining books and records and investigating the matter, Plaintiffs failed to plead facts supporting a reasonable inference that Buce or Krafcik knew about the USAA website redesign or its potential impact on TrueCar until September 2017, *after* they made their sales.[241]

As to Yadigaroglu, to whom Capricorn's sales are attributed, the Complaint alleges that Capricorn entities sold approximately 509,000 shares of TrueCar stock in the Secondary Offering on May 2, 2017, and an approximately 175,000 shares in late August 2017, for total proceeds of approximately $11.28 million.[242] The

---

239 Pls.' Answering Br. at 50 n.17.

240 823 A.2d at 505 (citation omitted) ("[T]he doctrine is not designed to punish inadvertence, but to police intentional misconduct[,]" thus, "it must be shown that each sale by each individual defendant was entered into and completed on the basis of, and because of, adverse material non-public information.").

241 *See* Parts III.D.1.a-b.

242 Compl. ¶¶ 169, 176.

Complaint alleges that these sales "are suspicious given that they occurred when TrueCar's stock traded at or near all-time highs and represented more than 31% of [Yadigaroglu's] holdings."[243]

Although a closer call, the sheer size of Capricorn's sales are not sufficient to support a reasonable inference of *scienter* in my view. In *Guttman*, when addressing larger insider trades—100% and 50% of the shares held by two insiders—then-Vice Chancellor Strine found that the size of the trades *alone* did not support an inference of *scienter* so as to expose those directors to a "real threat of liability":

> In the absence of any fact pleading that supports a rational inference that any of these directors had some basis to believe that [the] statements were materially misleading in a manner that inflated the company's stock price, the mere fact that two of the directors sold large portions of their stock does not, in my view, support the conclusion that these directors face a real threat of liability.[244]

The court was even less receptive to the claim against other directors who sold "much smaller stakes" of 32%, 20%, and 10% of their shares.[245]

---

[243] *Id.* ¶ 169.

[244] *Guttman*, 823 A.2d at 504; *see also Silverberg ex rel. Dendreon Corp. v. Gold*, 2013 WL 6859282, at *11-13, *15 (Del. Ch. Dec. 31, 2013) (board materials showed discussions and awareness, for over a year, of problems and directors sold 77% and 58% of their holdings).

[245] *Guttman*, 823 A.2d at 504.

Here, as with Buce and Krafcik, the Complaint is devoid of any well-pled facts that Capricorn's trades represented a deviation from its past trading practices. Most importantly, to repeat, despite investigating the matter, Plaintiffs were unable to plead facts supporting a reasonable inference that Yadigaroglu knew about the USAA website redesign or its potential impact on TrueCar until September 2017, *after* each of Capricorn's stock sales.

In sum, as to Buce, Krafcik, and Yadigaroglu, Plaintiffs have failed to allege particularized facts that support a reasonable inference that any of them possessed material nonpublic information when they traded, much less that they consciously acted to exploit such information. Accordingly, Plaintiffs have failed to show that Buce, Krafcik, or Yadigaroglu would face a substantial likelihood of liability for the *Brophy* claim so as to impugn their impartiality to consider a demand.

\* \* \* \* \*

For the reasons explained above, the Complaint fails to plead with particularity facts sufficient to impugn the impartiality of any of the members of the Demand Board to consider a demand with respect to the *Brophy* and unjust enrichment claims. Accordingly, those claims will be dismissed for failure to plead demand futility under Court of Chancery Rule 23.1.

70

The aiding and abetting claim in Count IV asserted against the Entity Defendants (Capricorn, Upfront, USAA, and Vulcan) also will be dismissed because "[t]he dismissal of the underlying insider selling and fiduciary duty claims logically compels the dismissal of the aiding and abetting claims."[246]

## F. The Contribution and Indemnification Claims

Count IV of the Complaint seeks contribution and indemnification on behalf of the Company from the Securities Class Action Defendants for "exposing the Company to significant liability under various federal and state laws by their disloyal acts."[247] The Individual Defendants moved to dismiss Count IV under Court of Chancery Rules 12(b)(6) and 23.1 contending, in part, that the claim "is unripe and will likely never ripen."[248] Plaintiffs responded that the district court in the Securities Class Action "obviate[d] any ripeness arguments" by granting final approval of the settlement in that action on January 27, 2020.[249] For simplicity, the court addresses this claim under Rule 12(b)(6).

---

[246] *Park Empls.' & Ret. Bd. Empls.' Annuity & Benefit Fund of Chicago v. Smith*, 2017 WL 1382597, at *10 & n.105 (Del. Ch. Apr. 18, 2017). Even if this did not logically follow, Plaintiffs have failed to plead demand futility as to this claim because only three of the eight Demand Board members (Claus, Nichols, and Yadigaroglu) are implicated in the aiding and abetting claims.

[247] Compl. ¶ 219.

[248] Individual Defs.' Opening Br. at 40; *see also id.* at 55.

[249] Pls.' Answering Br. at 53.

The court takes judicial notice of the Settlement Agreement and the district court's final approval of the settlement in the Securities Class Action, the terms of which are not subject to reasonable dispute between the parties.[250] The Settlement Agreement, which the parties entered into to fully and finally resolve the Securities Class Action, provides for a payment in the amount of $28.5 million for the benefit of a class of TrueCar stockholders to be paid by the "Parties and Defendants' directors' and officers' liability insurance carriers" (as defined in the Settlement Agreement, the "D&O Insurers").[251] The Settlement Agreement further provides that the payments from the D&O Insurers "are the only payments to be made on behalf of any and all of the Defendant Releasees in connection with the Settlement."[252] Given the express terms of the Settlement Agreement, which the district court has approved, Plaintiffs cannot state a reasonably conceivable claim for contribution or indemnification from the Securities Class Action Defendants because they face no personal exposure with respect to that litigation.

---

[250] Del. R. Evid. 201-02; *In re Rural Metro*, 2013 WL 6634009, at *7-9 (discussing Del. R. Evid. 201-02 and taking judicial notice of a federal court filing). Plaintiffs submitted a copy of the Final Approval Order with their brief.

[251] Settlement Agreement § 2.1.

[252] *Id.* at § 2.2. The term "Defendant Releasees" includes the Demand Board directors named as defendants in the Securities Class Action, *i.e.*, Buce, Claus, Krafcik, Lantz, Nichols, and Yadigaroglu. *See id.* §§ 1.12, 1.21.

Plaintiffs' fallback position is that, "even if the settlement is, in fact, paid by insurance," TrueCar's "future policies will cost more as a result of the settlement."[253] This is sheer speculation that does not state a ripe, reasonably conceivable claim for relief.[254] For the reasons explained above, Count III will be dismissed for failure to state a claim for relief.

## IV. CONCLUSION

For all the reasons explained above, Defendants' motions to dismiss the Complaint are GRANTED. The Complaint is hereby dismissed with prejudice in its entirety.

**IT IS SO ORDERED.**

---

[253] Pls.' Answering Br. at 55.

[254] *See Baiera*, 119 A.3d 44 ("A simple allegation of potential directorial liability is insufficient to excuse demand, . . . .") (quoting *In re Goldman Sachs Gp., Inc. S'holder Litig.*, 2011 WL 4826104, at *18 (Del. Ch. Oct. 12, 2011)).